Filed 5/18/21  P. v. Mixon CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RICARDO MIXON et al.,<br><br>    Defendants and Appellants. | B299457<br><br> (Los Angeles County<br> Super. Ct. No. TA143131)<br><br>**ORDER MODIFYING OPINION AND DENYING PETITIONS FOR REHEARING**<br><br>**[CHANGE IN JUDGMENTS]** |

THE COURT:

It is ordered that the opinion filed herein on April 27, 2021, be modified as follows:

On page 3, the first paragraph, second sentence, beginning "We agree with the parties" is deleted and the following sentences are inserted in its place:

We agree with the parties that the matter must be remanded to the trial court with directions to strike the second multiple murder special circumstance finding and amend the abstracts of judgment accordingly.  We also direct the trial court to amend the abstracts of judgment to reflect (1) no parole revocation fine as to all three defendants, and (2) a joint and several obligation to pay victim restitution.

On page 66, the first sentence of the Disposition, beginning "The trial court is directed" is deleted and the following sentences are inserted in its place:

The trial court is directed to strike the second multiple murder special circumstance finding and amend the abstracts of judgment accordingly.  We also direct the trial court to prepare new abstracts of judgment that reflect (1) no parole revocation fine as to all three defendants, and (2) a joint and several obligation to pay victim restitution.

This modification changes the judgments.

The petitions for rehearing filed by defendants and appellants Deshun Armstead and Daniel Hill are denied.

_____

LUI, P. J.          ASHMANN-GERST, J.          HOFFSTADT, J.

3

Filed 4/27/21  P. v. Mixon CA2/2 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RICARDO MIXON et al.,<br><br>Defendants and Appellants. | B299457<br><br>(Los Angeles County<br>Super. Ct. No. TA143131) |

APPEALS from judgments of the Superior Court of Los Angeles County.  Patrick Connolly, Judge.  Affirmed and remanded with directions.

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant Ricardo Mixon.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant Deshun Armstead.

Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant Daniel Hill.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In an act of revenge following the shooting of their fellow gang member, defendants and appellants Ricardo Mixon (Mixon), Deshun Armstead (Armstead), and Daniel Hill (Hill) went into rival gang territory and shot and killed two innocent victims. Following a jury trial, defendants were each convicted of two counts of first degree premeditated murder (Pen. Code, § 187, subd. (a)).[1]  As to each defendant and both counts, the jury found true the allegations that defendants had committed multiple murders (§ 190.2, subd. (a)(3)); the murders were gang-related (§ 186.22, subd. (b)(1)); and that a principal discharged a firearm causing death (§ 12022.53, subds. (d) & (e)(1)).  The jury further found true the allegation that Mixon personally discharged a firearm causing death (§ 12022.53, subd. (d)).

Armstead and Mixon were each sentenced to 70 years to life in state prison plus two consecutive terms of life without the possibility of parole (LWOP).  Hill was sentenced to 50 years to life in state prison plus two consecutive LWOP terms.

_____

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

2

Defendants timely appealed their judgments of conviction, raising a host of arguments. We agree with the parties that the matter must be remanded to the trial court with directions to amend the abstracts of judgment to reflect (1) no parole revocation fine as to all three defendants, and (2) a joint and several obligation to pay victim restitution. Also, the 10-year gang enhancement imposed against Armstead is stricken. And, the trial court is directed to order that errors in Hill's probation report be corrected and then transmitted to the California Department of Corrections and Rehabilitation. In all other respects, we affirm the judgments.

## FACTUAL BACKGROUND

I. *Prosecution's Evidence*

A. <u>After Khiee Grant (Grant) was shot by apparent gang rivals, Hill indicates his intent to take action in response</u>

At around 4:45 p.m. on April 23, 2017, Grant was walking in Los Angeles, when men in a car stopped alongside him and asked if he was a gang member. Grant turned away from them. One of the men shot Grant in the back and drove away.

Grant was an Athens Park Blood gang member[2] known as "Poppie." The shooting occurred very close to 13111 South San

---

[2] At trial, on direct examination by the prosecutor, Grant denied that he was a gang member, denied that he knew anyone who was an Athens Park gang member, denied that his moniker was Poppie, and denied knowing any of the defendants. He denied making various statements to the officers who spoke to him at the hospital, but insisted he had been forthcoming with them.

Pedro Street, an apartment complex commonly referred to as the Villas. A parking lot at that complex was used as a hangout for Athens Park gang members and a closely allied gang called Miller Gangster Bloods.

Grant used his phone to call for an ambulance. Before emergency personnel arrived, a bystander Grant supposedly did not know stopped to assist, and drove Grant to the hospital. That Good Samaritan, not Grant, called the police.

At 4:45 p.m., Los Angeles County Sheriff's Department Detective Gregory Richardson arrived at 129th Street and San Pedro in response to a call regarding the shooting. An individual at the scene told him that a bystander had driven the victim to the hospital. Detective Richardson went to the hospital and spoke to Grant, who did not identify who had shot him.

At 5:04 p.m., Hill texted someone to say his "'little cousin'" Poppie had just been shot, and that he intended to "go to the AP's."[3] The person advised Hill to "'be safe'" and "'watch [his] surroundings.'"

B. <u>That evening, defendants and other gang members gather at the hangout near where Grant was shot</u>

There are various surveillance cameras at the Villas, and they recorded defendants and other gang members gathering in the parking lot shortly after Grant was shot.

Armstead was wearing a red hoodie, white undershirt, long white or gray basketball shorts, black shoes, and white socks.

---

[3] "AP's" is an acronym for Athens Park, but it is also used to refer to the Villas.

4

His right sock was noticeably higher than the left (and would remain so throughout the night, as documented by the videos).

Hill was wearing a black baseball hat, long-sleeved white shirt, light blue jeans, and a black backpack. After arriving at the lot, he changed his shoes.

Mixon was wearing a red hoodie, and black pants with large white patches or symbols, and red shoes.

The video showed all three defendants mingling with several other known gang members, including Thomas Speed (Speed) and Daivon McKinley (McKinley). Speed was an Athens Park member, was roughly 10 years older than Hill and Mixon,[4] and had the level of seniority to organize a shooting.

Meanwhile, Los Angeles Police Department Officer Manuel Armenta, who was assigned to monitor Athens Park and Miller Gangsters, became aware of Grant's shooting after seeing gang members discussing it on social media. Officer Armenta had encountered Grant multiple times in the past, both at the Villas lot, and in the company of Athens Park gang members, including Speed.[5] Officer Armenta had also encountered Armstead and Mixon in the past. Indeed, he had contacted Mixon while Mixon was in the company of Speed, and had contacted Armstead while Armstead was with Speed. Officer Armenta visited the Villas almost daily in the course of his duties.

---

[4] At the time of the murders, Mixon was 19 years old, Hill was 20 years old, and Armstead was 24 years old.

[5] At trial, Grant said that he did not know Speed.

5

Seeing the social media discussion of the shooting, Officer Armenta and his partner went to the Villas lot to talk to the gang members congregating there, gather information about Grant's shooting, and attempt to discourage a retaliatory shooting. The officers arrived at the lot at around 8:30 p.m. and interacted with approximately 18 men. Since it was such a large crowd, two other officers arrived to assist. The interaction was videotaped by the officers' body cameras and surveillance cameras at the scene, and audiotaped through the patrol car's system. The recordings, which included overlapping conversations, were played at trial.

One video showed the officers interacting with all three defendants.

The interactions between the officers and men at the lot were conversational; there were no threatening comments or conduct by anyone. The officers found no weapons on the men in the lot. The officers received a request for assistance and departed the lot at around 8:55 p.m. Before leaving, Officer Armenta directed all the men to go home, but did not ask about Grant's shooting.

C. Hill drives Armstead and Mixon to commit the murders

At 8:57 p.m., Hill left the Villas lot in the Audi that would be used in the murders. McKinley was driving, and Hill was in the backseat. The four-door Audi had distinctive features including that, when its doors were open, round lights were projected on the ground.

At 9:17 p.m., Armstead and Mixon left the Villas lot in a white Cadillac STS driven by Speed.[6] Immediately behind the white Cadillac was a dark blue Cadillac driven by yet another gang member.

Meanwhile, victims Aaron Roseboro (Roseboro) and his cousin Shakere Chambers (Chambers) were walking in front of the townhouse where Roseboro lived in Los Angeles. Neither Roseboro nor Chambers were involved with gangs. However, they were young and Black, and Roseboro was wearing a Yankees baseball cap, which was commonly worn by members of the East Coast Crips gang. The townhouse was on a residential street that had not been the site of gang activity for several years, but it was in a territory claimed by the East Coast Crips.

At 9:39 p.m., the white Cadillac STS drove past the street.[7] At 9:42 p.m., Hill, now driving the Audi, pulled up alongside the

---

[6] Officer Armenta had seen Speed driving the Cadillac in the past.

[7] The shootings were videotaped by surveillance cameras in the area, and the videos were played for the jury. Defendants' faces could not be seen in the video recordings. Armstead and Hill's heads were covered by hoodies, and Hill remained behind the wheel of the Audi. However, they were still identifiable by body types and clothing. Mixon was dressed the same as earlier, including the pants with patches. Armstead was dressed the same as before, including the higher right sock. Hill's long white sleeves and dark hat were visible. The Audi's distinctive round lights were projected on the ground when defendants opened the doors to commit the murders.

7

two victims and stopped.  Armstead and Mixon exited the Audi and immediately started firing.  Mixon was holding a rifle and fired numerous shots, striking Roseboro five times and Chambers four times.  Armstead was holding a handgun.  He fired a single shot into the living room of the townhouse.  His gun then jammed and he attempted to clear the jam.  Armstead and Mixon reentered the Audi, and Hill drove them away.  Chambers died immediately.  Roseboro died a few minutes later.

  D.  <u>Defendants return to the prior gathering site</u>

  At 9:46 p.m., the Audi was videotaped returning to the Villas, with Hill still driving and Armstead and Mixon still inside.  Although their faces were not visible on the recorded video, Hill's long white sleeves and the red hoodies worn by Armstead and Mixon were visible on the recording.[8]  The Audi returned from the North, which was consistent with taking a direct path from where the murders had occurred, approximately 1.3 miles from the Villas.

  The Audi drove out of view of the video cameras for a few seconds.  Less than a minute later, defendants walked into view of the video cameras from where the Audi had gone, still dressed as they had been at the time of the murders, except Armstead had removed his red hoodie.  Mixon was still wearing a red

---

[8]  Discussing the videos, the trial court opined that it was "clear" that the Audi's driver was wearing a long-sleeved white shirt when the car returned to the Villas lot.  The trial court also noted how specifically the shooters' clothing matched what defendants were wearing before and after the shooting at the Villas.

hoodie and also seemed to be holding a red hoodie. Hill was twirling a lanyard or cable, which he had been doing at the Villas before the murders. At 9:53 p.m., the cameras recorded Speed handing Hill what appeared to be a phone.

In the minutes before and during the murders, several calls were placed between Mixon and Hill's phones. Cell phone location data showed both phones in the area of the murders at the time of the murders.

E. <u>Mixon's police interview and admission to participating in the revenge shooting</u>

Mixon was arrested on April 28, 2017, and participated in a recorded interview with Detectives Samuel Marullo and Sarah Callian later that day. He said that he left the Villas in the white Cadillac, and was dropped off so he could get in the Audi. He claimed that he was directed to drive the car. In discussing why he switched cars, he indicated that it was because he felt he might be harmed if he refused, and expressed concern about cooperating with the police. When asked why he committed the shooting, Mixon asked if that was a "rhetorical question," and then answered that it was because of Grant's shooting. Mixon said that he arrived at the Villas right after Grant was shot and saw him bleeding heavily before a friend took Grant to the hospital. In describing seeing Grant bleeding, Mixon began crying.

F.  Hill's police interview and admission that he drove the Audi because he had been ordered to do so by older gang members

On May 2, 2017, Hill was arrested and participated in a recorded interview with Detectives Marullo and Callian.

During the interview, Hill was shown video taken at the Villas before the murders, and he identified himself as the person wearing a backpack and changing his shoes.  He said that he got in the car with others, went to a location on Mettler Street, and socialized for roughly 30 minutes.  Detective Marullo commented on how upset he was that older gang members would put a person like Hill "in that situation," and told Hill that those senior members were free and enjoying themselves while he was in custody.  Hill said that he was frightened that if he cooperated with police, he would be attacked in jail, and explained that his brother was currently in jail and had told him about how dangerous it was.

After being shown video of the Audi returning to the Villas, Hill described parking it out of sight of the cameras.  Hill briefly used ambiguous language ("I do believe I parked it, yes"), but then confirmed that he had parked and exited the Audi.  He did not want to identify the men he was videotaped walking with.  He said that "older people" directed him to drive the car.  He claimed that he drove the Audi to the Villas from Mettler Street.  Detective Marullo explained that he knew Hill was lying about merely driving the Audi from Mettler Street to the Villas.[9]

_____

[9]     At trial, Detective Marullo explained that the time between the murders and the Audi's return to the Villas, as well as the

10

Detective Marullo said that, although they knew Hill was not one of the shooters, they wanted to know the nature of his involvement—whether he knew about the plan, and whether he had been ordered to participate. Hill responded, "I was ordered to do it. I was pushed to do it."

G. Armstead's arrest and fake identity

On July 3, 2017, Armstead was arrested in Las Vegas. When stopped, he gave a fake name and presented a driver's license, credit card, and social security card in that fake name. Prior to the arrest, Armstead had posted on social media that it was "stressful to be on the run."

Two videos found on Armstead's phone (and presented at trial) showed him holding a nine-millimeter handgun.

H. Gang evidence

Officer Armenta testified that the primary activity of the Athens Park and Miller Gangster gangs was committing illegal narcotics sales and violent crimes, including murder. Members of those gangs had committed murders, and also been killed themselves. At the time of Grant's shooting, those gangs' only significant rival in the area was the East Coast Crips. Respect was very important to gang members, and it was essentially "required" for a gang to take violent revenge upon being attacked by rivals, especially if the attack occurred in their own territory.

---

direction it came from before turning into the lot, was consistent with having come directly from the murders. The timing and direction were not consistent with driving to the Villas from the location on Mettler Street mentioned by Hill in the interview.

11

Although every gang member was required to commit crimes on behalf of the gang, only roughly 10 percent participated in crimes as violent as drive-by shootings. As to such shootings, a member might volunteer, but would be directed or authorized to do so only if trusted to carry it out. When directed to commit a crime, a gang member risked serious injury from his own fellow gang members if he refused to carry out the assignment. A gang member that cooperated with the police risked being harmed or killed by other gang members.

Like Grant, Armstead was an Athens Park gang member. His tattoos included one that indicated that he was a "Crip Killer" and one that reflected an alliance between Athens Park and Miller Gangsters. It was unknown whether he had the Crip Killer tattoo before the instant murders. Photographs were presented showing Armstead socializing with other gang members at the Villas, and throwing signs that indicated disrespect to the East Coast Crips. At some point after the instant murders, Armstead got new tattoos, including one showing alliance with Miller Gangsters.

Hill too was an Athens Park member. Prior to the instant murder, he had Athens Park tattoos, and had been photographed throwing a sign indicating disrespect to the East Coast Crips. After the murders, he got several gang tattoos on his face, including one that indicated he was a Crip Killer, and one insulting the East Coast Crips.

Mixon was a Miller Gangsters member. After the murders, Mixon got new Miller Gangster tattoos.

## II. *Defense Evidence*

Armstead called his older sister to testify. She stated that Armstead had been living in Las Vegas prior to the murders, but would sometimes visit family in Los Angeles. She felt law enforcement was blaming him for "something he didn't do."

Mixon and Hill called no witnesses.

## III. *Armstead's Conduct during Trial*

During trial, Armstead engaged in substantial misconduct, some of which was observed by the jury.[10] During the prosecutor's closing argument, it became apparent to counsel for Armstead that Armstead was about to make an outburst. The trial court excused the jury. Armstead directed profanity at the prosecutor, said he no longer wished to be in the courtroom, and confessed to committing the murders: "Athens Park Bloods, dude, we's did that. So what, dude. F*** these people, you all."

Upon resuming the proceedings, the trial court informed the jury that Armstead had chosen to be absent. The following day, Armstead was permitted to return to the courtroom. However, as soon as his attorney began his closing argument, Armstead produced either feces or vomit and started rubbing it on his face and the table. The jury was once again removed from

---

[10] Prior to trial, Armstead was admonished by the trial court for making sounds. Midway through trial, out of the jury's presence, he began directing slurs and using profanity towards the prosecutor.

the courtroom before order could be restored and the proceedings resumed.[11]

## DISCUSSION

I. *Defendants' Batson/Wheeler[12] Objections*

Defendants contend that the prosecutor[13] improperly excluded four prospective jurors for being Black. Specifically, Mixon argues that the trial court erred in failing to demand that the prosecutor explain his reasons for dismissing those prospective jurors, failed to evaluate whether the prosecutor's stated race-neutral explanations were sincere, and impermissibly volunteered its own opinion as to possible race-neutral justifications for excluding those four Black prospective jurors. In that way, Mixon claims, the trial court utilized the wrong *Batson/Wheeler* standard when evaluating defendants' motion. Mixon also asserts that the defense attorneys' comments, when considered together, amounted to an assertion that the prosecutor had excused prospective jurors on account of gender,

---

[11]    The trial court opined Armstead's behavior reflected planning, not incompetency. Nevertheless, Armstead did receive a mental health examination. The trial court also opined that video of Armstead's outburst showed Hill and Mixon reacting in a manner that indicated that they had advance knowledge of his planned disruption.

[12]    *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

[13]    There were two prosecutors. Like Hill and the People, we refer to both as "the prosecutor" for ease.

14

and the trial court failed to properly demand that the prosecutor respond to that claim.  Finally, Mixon contends that the trial court did not demonstrate even a "hint of concern" to its task, and such "comfortable indifference" to constitutional requirements compels reversal of the judgment as opposed to remanding the matter for a new *Batson/Wheeler* hearing.

Armstead joins in Mixon's arguments.  He further contends that the trial court failed to make a sincere and reasoned attempt to evaluate the credibility of the prosecutor's stated reasons for excusing the Black prospective jurors.  According to Armstead, the trial court's comments reflect that it had determined that the prosecutor had dismissed the prospective jurors on account of race, but nevertheless denied defendants' motion.  Finally, for the first time on appeal, Armstead argues that some of the race-neutral reasons cited by the prosecutor also applied to other individuals on the panel.

Hill joins in Armstead's and Mixon's claims.

A. <u>Relevant proceedings</u>

1. *Initial questioning of prospective jurors*

Jury selection began on March 26, 2019.  All of the prospective jurors at issue in the instant claim were in the first group of 18 jurors put in the box.  The trial court questioned the prospective jurors first.  The prospective jurors were then questioned by Mixon's counsel, Hill's counsel, and Armstead's counsel.  Thereafter, the prosecutor questioned the 18 prospective jurors.

During the course of his questioning, the prosecutor directly questioned the prospective jurors sitting in seat

numbers 1, 6, 7, 8, 13, 14, 16, and 18. In addition, the prosecutor invited responses from all of the prospective jurors. For example, he asked general questions and then followed up if anyone raised their hands. He asked a follow up question to Prospective Juror No. 2406 and then asked other jurors if they agreed with his comments. He also asked a follow up question to the prospective juror in seat number 16 and then asked the other prospective jurors if they agreed. Later, he asked the prospective juror in seat number 18 a question and again asked the other prospective jurors if they agreed.

2. *Relevant Prospective Jurors*[14]

Prospective Juror No. 3127, who is Black, stated that she had been convicted of vandalism and assault. She married her husband sometime after he had been convicted of robbery with use of a firearm and sentenced to 14 years in state prison. She said that she would sometimes not report crimes to police because she did not want to get involved and for concern of the "outcome that may come along with that." Also, a relative that she regularly spoke to was "the supervising clerk" in the district attorney's office in the Compton courthouse.

Prospective Juror No. 1059, who is Black, stated that one of her brothers had been convicted of bank robbery, and another one had been convicted of possession of marijuana. She had family

---

[14] During defendants' *Batson* motion, six prospective jurors were discussed, although only four were actually cited as grounds for the motion: Prospective Juror Nos. 3127, 1059, 3100, and 2406.

16

members that were gang members.  Her car had been stolen three times and no one had ever been caught.  She worked for the Los Angeles County Probation Department in a juvenile camp.  After summarizing her occupation, she added:  "I don't have any jury experience, they kick me off all the time."

Prospective Juror No. 6874, who is probably Latina, reported that her stepbrother was an officer in the Los Angeles Police Department.  She thought a police officer would be less likely than a nonofficer to admit to having made a mistake.  Even if a crime had been on video, she would still want to hear testimony from the victim.  She had not reported a crime in the past because she did not think that the culprit would be caught and it would be a "waste of time."  Her car had been broken into "various times," and no one had been caught.

Prospective Juror No. 3100, who is dark-skinned and possibly of Samoan, Asian, or African-American descent, said that her brother had been "in and out" of custody and she did not believe that he had been "treated fairly."  She specifically believed that his sentence of 14 years in state prison was excessive for "just . . . beating up some guy."  She viewed the police negatively because of an incident roughly 20 years earlier when police killed two of her "distant relatives" when they responded to a "domestic issue with the wife."  She did not think that she could be a "fair" juror and did not think that she was the right person to be a juror in this case.  Her car had been broken into, and the perpetrator had not been caught.

Prospective Juror No. 2406, who is Black, stated that his home had been burglarized, he had testified at a trial, and had

17

not been satisfied with the way the process was handled. He did not believe he could "get facts" from hearing testimony. He thought police officers were less likely than nonofficers to admit having made a mistake due to their degree of power, and that "nine out of ten" officers would not admit having made a mistake.

After the prosecutor used up his time, the trial court followed up. This prospective juror reaffirmed that he believed that there was a "high probability" that officers would not admit to having made a mistake, and added that he had "dealt with . . . bad cops." But after more questioning from the trial court, he said that he was not limiting his opinion to officers, and was referring to "everybody." He had spent almost his entire life living in "gang infested areas" and agreed with the sentiment that people could socialize with gang members without even realizing they were gang members.

Prospective Juror No. 2009, who is probably Latina, stated that her uncle and godfather (it was not clear if this was the same person) had been in and out of custody for various crimes including robbery and assault with a deadly weapon, and her cousin was in custody for a recent "shooting spree" with multiple victims. She viewed defendants to be as credible as police officers, and would be more likely to trust a neutral eyewitness than someone affiliated with either party.

3. *Prosecutor's motion to dismiss prospective jurors for cause*

After the trial court finished asking follow up questions, the prosecutor moved to dismiss for cause the prospective juror seating in seat 16, as well as Prospective Juror Nos. 3127, 3100,

18

and 2406. The trial court agreed to dismiss the individual in seat 16, but declined to dismiss the other three. That said, the trial court agreed that as to all three the prosecutor had at least a basis for making the request. The trial court acknowledged that Prospective Juror No. 3127's comments had raised some doubt, and the trial court had been surprised that the prosecutor had not followed up. Regarding Prospective Juror No. 3100, the court opined that the juror's views of her own fitness to sit on the case were not dispositive, and her stated bias against the police was not grounds for cause since the instant case did not involve use of force by the police. However, the trial court acknowledged that it had intended to follow up but had forgotten, knew she would not "be sitting," and expected she would "be the first one booted." As to Prospective Juror No. 2406, the trial court was "concerned" by his statements, but disputed the prosecutor's characterization of its questioning as "rehabilitat[ing]" him.

During this discussion, Armstead's counsel offered the observation that the prosecutor had questioned six people and that all of them appeared Black. The trial court indicated its belief that Prospective Juror No. 3100 was Samoan. No record was made as to how many of the 18 individuals in the box were Black.

### 4. *Peremptory challenges*

As predicted by the trial court, the prosecutor used his first peremptory challenge against Prospective Juror No. 3100. He used his next peremptory challenges against Prospective Juror Nos. 3127, 6874, 2406, 2009, and 1059.

19

### 5. *Defendants' Batson/Wheeler motion*

After the prosecutor challenged his sixth prospective juror, Mixon's counsel stated "we have a motion." Armstead's counsel concurred: "I'm making a motion pursuant to [*Wheeler*]. It's my belief that the district attorneys are targeting African Americans."

The motion was argued by Armstead's counsel, who asserted that the prosecutor was targeting Black people, as demonstrated by the fact that "five" of the six people excused had been Black.[15] Mixon's counsel added that five of the six people dismissed by the prosecutor had been women and all were minorities "of some sort." Hill's attorney "joined" in the motion, but added no other comment.

### 6. *Prosecutor's response*

The trial court invited the prosecutor to respond. Referring to Prospective Juror No. 3127, the prosecutor cited the facts that her husband was in prison, and that she had not reported crimes in the past. The prosecutor then corrected the false suggestion that he had only questioned Black people, and emphasized that he had asked questions open to the entire panel, and then followed up with those who had raised their hands. The trial court responded that he had predominantly spoken to Black people, and that regardless, the more important matter was who he had actually dismissed.

---

[15] Despite saying "five," Armstead's counsel identified only four individuals: Prospective Juror Nos. 3100, 3127, 2406, and 1059.

20

The trial court asked the prosecutor about Prospective Juror No. 3100.  The prosecutor explained that she believed that her brother had not been treated fairly.

The trial court then asked about Prospective Juror No. 2406.  The prosecutor explained that he was unhappy with how the burglary of his home had been handled, and believed that police officers would not admit to having made a mistake.

Regarding Prospective Juror No. 1059, the prosecutor noted that she had relatives that were gang members, commented that some gang members were good people, and in describing her job with the probation department, emphasized she did not work closely with law enforcement.

At that point, for unknown reasons, the trial court interrupted the prosecutor and said, "Let me just stop you there. Quite honestly, you're all over the place and you need to be—this is a special circumstance case.  I would expect somebody trying a misdemeanor case to be more on top of this."

### 7. *Defendants' reply*

After the trial court stopped the prosecutor from explaining his reasons for dismissing certain prospective jurors, it asked if the defense attorneys had anything to say.  Armstead's counsel stated, "I don't believe he addressed seven of the jurors."[16]

---

[16]    It appears that Armstead's counsel misspoke, since the prosecutor had only dismissed six individuals, and when he argued the motion, he only identified four people.

21

The following exchange occurred:

"[The Court]: It doesn't matter. I'm stopping him here, because this is just going to be a complete waste of time.

"[Armstead's counsel]: Okay.

"[The Court]: [Prosecutor], do you have anything to add?

"[Prosecutor]: I can address the other jurors that were kicked.

"[The Court]: You don't need to. [¶] Are we good?

"[Armstead's counsel]: Yes."

No defense attorney objected or asked for further discussion.

8. *Trial court's order denying defendants' motion*

After that exchange, the trial court summarized the six peremptories used by the prosecutor in the order in which they were made. As to Prospective Juror No. 3100, the trial court described her as a dark-skinned, possibly Samoan, woman. Her answers indicated that she could not be fair to the police, that the prison sentence her brother received had been unfair, and that this was not the right case for her to be on.

The trial court described Prospective Juror No. 3127 as a Black woman who had married someone after he was sentenced to prison, and who made some comments indicating skepticism of law enforcement.

The trial court described Prospective Juror No. 6874 as either a White or possibly Latina woman. Instead of summarizing her statements, the trial court emphasized that it had found that there was no prima facie case of gender-based exclusion, stating: "[T]he court is satisfied that, as far as anyone

22

being female, that this is not an attempt to kick females off. The court's emphasis here, more so, is with African Americans, as brought up by [Armstead's counsel]."

The trial court described Prospective Juror No. 2406 as a Black man who made statements so negative about law enforcement that the trial court had also questioned him.

The trial court described Prospective Juror No. 2009 as either a White or Latina woman. It then stated: "But, again, there was nothing there that makes the court believe that there was anything that was—that made it appear that she was being—[excused] as far as her sex. As a matter of fact, I believed that she was actually good for the People, and I believed that they were excluding her because they were going to be excluding other African Americans."

The trial court described Prospective Juror No. 1059 as a Black woman. It summarized her statements, opined that she would have been a good juror, but emphasized that it credited the prosecutor's explanation as truthful.

Ultimately, the trial court stated: "All right. But with what the People have said so far, it is consistent—their belief is consistent with the answers that she has given. [¶] And so at this point in time the court is not finding that there has been a violation."

### 9. *Defendants' omissions*

During the discussion of defendants' motion, no record was made as to the number of Black people or women on the panel, or whether the defense had used peremptories to dismiss Black people or women. No defense attorney argued that the

23

prosecutor's statements had been factually incorrect, or attempted to compare the statements the prosecutor cited to similar statements given by other prospective jurors. And no defense attorney argued that the trial court's ruling was unclear or incomplete, or that the trial court had suggested a reason for dismissing the prospective jurors not mentioned by the prosecutor.

B. Relevant law

Both the state and federal Constitutions prohibit the use of peremptory challenges to remove prospective jurors based solely on group bias, such as race, gender, or ethnicity. (*Batson, supra,* 476 U.S. at p. 89; *People v. O'Malley* (2016) 62 Cal.4th 944, 974; *People v. Gutierrez* (2017) 2 Cal.5th 1150, 1157; *Wheeler, supra,* 22 Cal.3d at pp. 276–277.) It is presumed that the prosecutor exercised peremptory challenges in a constitutional manner, and the appellant bears the burden of rebutting that presumption. (*People v. Johnson* (2015) 61 Cal.4th 734, 755; *People v. Manibusan* (2013) 58 Cal.4th 40, 76.)

In determining whether the presumption of constitutionality is overcome, the trial court applies the well-established three-step inquiry set forth in *Batson.* (*People v. Taylor* (2009) 47 Cal.4th 850, 885.) "First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination.

24

The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. [Citation.]  The three-step procedure also applies to state constitutional claims.  [Citations.]"  (*People v. Taylor*, *supra*, at pp. 885–886; see also *People v. Thomas* (2011) 51 Cal.4th 449, 473.)

"At the third stage of the *Wheeler/Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.  Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.'  [Citation.]  In assessing credibility, the court draws upon its contemporaneous observations of the voir dire.  It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her.  [Citation.]" (*People v. Lenix* (2008) 44 Cal.4th 602, 613.)  The proper focus is on the subjective genuineness of the nondiscriminatory justifications given, not on their objective reasonableness. (*People v. Reynoso* (2003) 31 Cal.4th 903, 924.)  A "'legitimate reason[]'" for excusing a prospective juror is not a reason that makes perfect sense, but one that is nondiscriminatory.  (*Id*. at p. 916.)

"Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence support its conclusions.  [Citation.]  'We review a trial court's determination regarding the sufficiency of a prosecutor's

25

justifications for exercising peremptory challenges "'with great restraint.'" [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]' [Citation.]" (*People v. Lenix, supra,* 44 Cal.4th at pp. 613–614.)

     C. <u>Analysis (alleged race-based reasons for exclusion)</u>

     Applying these legal principles, we conclude that the trial court properly denied defendants' *Batson/Wheeler* motion. The prosecutor offered race-neutral explanations for dismissing the four Black prospective jurors identified by Armstead's defense attorney. The prosecutor's assertions were accurate summaries of those prospective jurors' statements and constituted nondiscriminatory grounds to dismiss them.

     On appeal, defendants do not seem to challenge that the prosecutor failed to offer a race-neutral explanation. Rather, their objection is that the trial court failed to subject the prosecutor's explanation to due scrutiny and that elements in the appellate record suggest that the prosecutor was lying.

     To the extent Mixon and Armstead contend that the prosecutor only questioned six people and that the questioning of those six individuals was motivated by race, their claim is contradicted by the appellate record. The reporter's transcript indicates that the prosecutor received answers from eight people

26

during the time afforded him and asked multiple questions that invited responses from everyone on the panel.

Defendants also contend that the trial court volunteered reasons for dismissing the prospective jurors that were never offered by the prosecutor. For example, Armstead claims that the trial court provided a race-neutral reason not mentioned by the prosecutor for dismissing Prospective Juror No. 3127, namely that she had expressed skepticism of law enforcement. Armstead mischaracterizes what occurred below.

As set forth above, when the prosecutor moved to dismiss Prospective Juror No. 3127 for cause, the prosecutor reasoned that her answers indicated that "she doesn't have faith in police, in law enforcement." Although the trial court denied the motion to dismiss for cause, it noted that it had expected the prosecutor to follow up during questioning and since he had not done so, Prospective Juror No. 3127's statements had been ambiguous enough not to merit dismissal for cause. Thus, when it noted her comments at the time it denied defendants' motion, the trial court was simply repeating what the prosecutor had earlier argued.

Similarly, Armstead asserts that, regarding Prospective Juror No. 3100, the trial court offered "another reason not offered by the prosecutor for why a prosecutor might theoretically want to excuse" her—that she said she did not think she was the right person to be a juror on the case. Armstead is incorrect.

As set forth above, the prosecutor moved to dismiss Prospective Juror No. 3100 for cause because she said she could not be "fair" to the prosecution. Although the trial court declined

27

to dismiss her for cause, it acknowledged that she had said that this was not "the kind of case that she should sit on." Presumably the trial court did not forget the conversation it previously had regarding the prosecutor's reasons for seeking to dismiss the prospective jurors, or that it had acknowledged during that earlier discussion that it was at least a close question as to whether three of the individuals at issue should be dismissed for cause.

To the extent defendants argue that the trial court failed to analyze whether the prosecutor's race-neutral explanations had been truthful, they are wrong. The trial court explicitly stated that it found the prosecutor's explanation of his justification to be truthful. And although the trial court opined that Prospective Juror No. 1059 would have been a good juror, its view was clearly not universal since that individual introduced herself by saying, "I don't have any jury experience, they kick me off all the time." (See generally *People v. Miles* (2020) 9 Cal.5th 513, 562 [the question is not whether a prosecutor should or should not have excused a prospective juror].)

Defendants' suggestion that the trial court did not scrutinize the prosecutor's motivations, or was not interested in the requirements of the state and federal Constitutions, is belied by the record. The record thoroughly establishes that the trial court paid close attention throughout the trial, was appropriately skeptical of the prosecution, and did its best to provide the parties a fair trial in accordance with the law and in difficult conditions in light of Armstead's repeated and intense efforts to disrupt the proceedings.

28

None of the three defense attorneys argued that the prosecutor had misstated a fact, or compared the individuals dismissed to jurors still on the panel, or expressed confusion at the trial court's ruling. Nor do defendants argue on appeal that any misstatement was made by the prosecutor. In fact, when the trial court asked Armstead's counsel, who had argued the *Batson/Wheeler* motion, "Are we good?" counsel answered, "Yes." Under these circumstances, no further oral explanation by the trial court was required. (See, e.g., *People v. Miles*, *supra*, 9 Cal.5th at pp. 539–540 [trial court was not required to engage in a more lengthy discussion; prosecutor's stated reasons were largely self-evident and required no further explication]; *People v. Hardy* (2018) 5 Cal.5th 56, 76 ["'When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings'"].)

D. Comparative juror analysis

For the first time on appeal, Armstead contends that comparative analysis shows that the prosecutor gave pretextual reasons for the removal of the four prospective jurors.

"Comparative juror analysis is evidence that, while subject to inherent limitations, must be considered when reviewing claims of error at [*Batson/Wheeler*]'s third stage when the defendant relies on such evidence and the record is adequate to permit the comparisons. In those circumstances, comparative juror analysis must be performed on appeal even when such an analysis was not conducted below." (*People v. Lenix*, *supra*, 44 Cal.4th at p. 607.)

29

"[C]omparative juror analysis is but one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination." (*People v. Lenix*, *supra*, 44 Cal.4th at p. 622.) As noted, "comparative juror analysis on a cold appellate record has inherent limitations," among them that "the prosecutor is never given the opportunity to explain the differences he perceived in jurors who seemingly gave similar answers." (*Id.* at pp. 622–623.)

In the instant case, the record is insufficient for us to conduct such analysis. There is no evidence regarding the race or gender of the other prospective jurors. And, Armstead ignores the prosecutor's valid, stated reasons for dismissing these four individuals.

Armstead claims that if the prosecutor's stated reasons were sincere, then he should have dismissed Prospective Juror Nos. 4438, 8923,[17] and 0876. Prospective Juror No. 4438 was dismissed by the prosecutor. The fact that that prospective juror may not have been dismissed until after the trial court denied defendants' *Batson/Wheeler* motion has no bearing on our analysis. And, Prospective Juror No. 0876 never moved to one of the first 12 seats before the prosecutor accepted the panel, and, in any event, was dismissed by the defense.

Under these circumstances, it would not be fair or fruitful to subject the prosecutor's reasons to comparative analysis. At

---

[17]    In his reply brief, Armstead notes that the trial court excused this juror for cause and, therefore, he "withdraws his prior comparison to this one particular juror."

30

the very least, we "'must keep in mind that exploring the question at trial might have shown that the jurors were not really comparable. Accordingly, we consider such evidence in light of the deference due to the trial court's ultimate finding of no discriminatory purpose.'" (*People v. Hardy*, *supra*, 5 Cal.5th at p. 77.)

E. Analysis (alleged gender-based exclusion)

Mixon also argues that the trial court mishandled the portion of the *Batson/Wheeler* motion that alleged that the prosecutor had improperly dismissed prospective jurors because they were women. He claims that the trial court's comments reflected a finding of a prima facie case of gender-based exclusion, and then impermissibly "chang[ed] its mind . . . mid-course" to find that no prima facie case had been made.

As set forth above, the defense attorneys did not articulate a *Batson/Wheeler* motion on the ground of gender. Rather, all Mixon's counsel noted was that five of the six people dismissed by the prosecutor had been women and all were minorities "of some sort." Other than this fact, there is no evidence whatsoever that the prosecutor excluded these persons because of their gender. In other words, Mixon did not demonstrate that a prima facie case had been made. And, notably, on appeal he does not argue that he made a prima facie case below. Nor could he. There is no evidence or allegation that the prosecutor struck most or all women from the venire or that the prosecutor failed to question them.

Because Mixon did not present a prima facie case of gender-based exclusion, the prosecutor was not obligated to

31

explain his reasons for dismissing these prospective jurors.[18]
(*People v. Scott* (2015) 61 Cal.4th 363, 387 ["a party exercising a
strike thus has no obligation to articulate a reason until an
inference of discrimination has been raised"].)

F. Conclusion

Our Supreme Court has recognized "'that it is a
combination of factors rather than any single one which often
leads to the exercise of a peremptory challenge'; that 'the
particular combination or mix of jurors which a lawyer seeks
may, and often does, change as certain jurors are removed or
seated in the jury box'; and that 'the same factors used in
evaluating a juror may be given different weight depending on
the number of peremptory challenges the lawyer has at the time
of the exercise of the peremptory challenge and the number of
challenges remaining with the other side.' [Citation.] 'It is
therefore with good reason that we and the United States
Supreme Court give great deference to the trial court's
determination that the use of peremptory challenges was not for
an improper or class bias purpose.' [Citation.]" (*People v. Chism*
(2014) 58 Cal.4th 1266, 1318.)

Substantial evidence supports the trial court's express and
implied finding that the prosecutor's proffered reasons were not
pretextual and that there was no race or gender discrimination.
Armstead's reliance on comparative juror analysis does not
undermine this conclusion.

---

[18]     That said, we note that the same race-neutral reasons for
dismissing the identified prospective jurors apply here as well.

II. *Denial of Mixon's Motion to Exclude His Pretrial Statement*

Mixon argues that his recorded statement to the police should have been excluded at trial because the detectives failed to honor his request for an attorney.

A. <u>Relevant proceedings</u>

Prior to trial, Mixon moved to suppress his recorded statement to the police on the grounds that he had not validly waived his federal constitutional rights.

1. *The interview*

Following his arrest, Mixon participated in a roughly 90-minute interview with Detectives Marullo and Callian.

At the onset of the interview, Detective Marullo asked Mixon if he had been arrested and told his rights in the past. Mixon replied that he had. Detective Marullo then explained that they were detaining him and therefore he would read him his rights. Mixon repeatedly interjected and said he knew he would not be going home following the interview. Detective Marullo advised him of his rights, and Mixon said he understood them. Mixon answered questions for a few minutes, claiming to not remember the premurders interaction with police at the Villas, and denying being in a gang.

Later, Mixon said, "you said when you was reading me my rights, uh I could have an attorney present?" Detective Marullo said he could. Mixon said, "All right, I think this conversation over 'til I get an attorney." Detective Marullo said "Okay." But Mixon did not stop talking. Instead, he made clear he wanted to continue the conversation. He immediately continued, "Because you're not trying to tell me why I'm here. You asking me a lot of

33

questions."  Detective Marullo responded that he was simply doing his job.  Mixon responded, "I'm not getting paid to be cold in that room.  I'm not getting paid, and I uh, I'm trying to figure out what's going on here."

Mixon then said, "I just want an attorney."  Detective Marullo replied, "[Y]ou have every right to have an attorney. And we respect that, okay.  I will inform you what you're here for. You're here for double murder.  I can't ask you any more questions 'cause you made it clear that you need an attorney. But I am telling you what you're being . . . arrested and booked for.  So you'll be arrested for double murder."  Detective Marullo and his partner stood up to leave.

Mixon immediately said, "Wait, wait, wait."  Detective Marullo responded, "You said you want an attorney."  Mixon said, "No, no, no, no, you talking about double murder, bro."  Mixon asked if he was really being arrested for double murder. Detective Marullo answered affirmatively, and this exchange occurred:

"[Mixon]:  No, no, no, sit back down, bro.  Sit back down.

"[Detective Marullo]:  No, you said you requested an attorney.

"[Mixon]:  Man, sit down, bro.

"[Detective Marullo]:  You want me to sit down?

"[Mixon]:  I want you to sit down.

"[Detective Marullo]:  Let me be clear about this 'cause I need to be extremely fair to you, and you have every right for me to be fair to you.  If I take a seat, you're welcoming me to take a

seat right now. Does that mean that you're giving up your right for now to have an attorney present?

"[Mixon]: Yeah."

Thereafter, they discussed the murders. Mixon asserted he only knew about the murders from hearing about them on the news, claimed he left the Villas with women in a gold hatchback to buy marijuana, claimed he had been wearing a black shirt and shorts, and denied being the man on the video taken at the Villas before the murders. He claimed drug use had impacted his memory, admitted to remembering the interaction with officers before the murders, and said that he was afraid he would be killed if he cooperated with the police and went to jail. He admitted to having lied about his clothing, said he left the Villas in the white Cadillac and then transferred to the Audi, and insisted he had been the one driving the Audi. He did not actually describe the murders or say who else was involved, but said he participated because he was told to, and was afraid of what might happen to him if he refused. He described arriving at the Villas in time to see Grant before Grant was taken to the hospital, and said the instant murders happened because of Grant's shooting.

2. *Defense expert testimony*

Gary Steiner (Steiner), a former police officer, opined that the interview should have ended when Mixon asked for an attorney, and critiqued the officers for being armed during the interview, having two officers in the room instead of one, and not allowing Mixon phone calls within three hours of his arrest. He also said that the officers should have explored whether Mixon

35

was intoxicated or had a learning difficulty, but cited no evidence indicating Mixon had been under the influence.

### 3. *Trial court's ruling*

The prosecutor asserted that Mixon's first mention of an attorney was vague, the second mention of an attorney was clear and was honored, and that Mixon thereafter reinitiated by insisting Detective Marullo keep speaking to him. Counsel for Mixon argued that Mixon's request for more information did not amount to reinitiating the conversation. The trial court agreed with the prosecutor's analysis.

### 4. *Evidence related to Mixon's interview used for his defense*

Mixon also established that during the police interview, he cried when discussing seeing Grant right after being shot. And, Mixon established during his cross-examination of Officer Armenta that a gang member could be killed for cooperating with the police, and seriously injured for refusing an order by a senior gang member.

In closing argument, counsel for Mixon argued that Mixon was guilty of second degree murder, but not first degree murder. Counsel did not specifically acknowledge the acts committed, but argued that Mixon acted without premeditation due to some combination of being upset about Grant's shooting and the police contact at the Villas.

B. <u>Relevant law</u>

*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) held that a defendant who is in custody "must be warned prior to any questioning that he has the right to remain silent, that anything

36

he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." (*Id.* at p. 479.)

These rights may be waived, as long as the waiver is voluntary, knowing and intelligent. (*Miranda, supra*, 384 U.S. at p. 444.) There are two dimensions to the waiver: "'First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.'" (*People v. Clark* (1993) 5 Cal.4th 950, 986, overruled in part on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

In other words, once a defendant requests counsel, he cannot be subjected "'to further interrogation by the authorities until counsel has been made available to him, unless [he] himself initiates further communication, exchanges, or conversations with the police.'" (*People v. Jackson* (2016) 1 Cal.5th 269, 339.)

"In considering a claim that a statement or confession is inadmissible because it was obtained in violation of a defendant's rights under [*Miranda*], *supra*, 384 U.S. 436, we accept the trial court's resolution of disputed facts and inferences, and its evaluation of credibility, if supported by substantial evidence.

37

[Citation.] Although we independently determine whether, from the undisputed facts and those properly found by the trial court, the challenged statements were illegally obtained [citation], we "'give great weight to the considered conclusions" of a lower court that has previously reviewed the same evidence.'" (*People v. Wash* (1993) 6 Cal.4th 215, 235–236.)

C. <u>Analysis</u>

Applying these legal principles, the trial court's ruling was proper. When Mixon first requested an attorney, the detectives respected his request by agreeing to stop asking him questions and telling him that he did not need to talk any further. They did not ask any question or describe any evidence. Instead, they simply disclosed the specific information that Mixon requested, namely the generic crimes that he was suspected of committing. They stood up and prepared to leave; they only remained because Mixon insisted that they continue conversing with him.

Before resuming the conversation, the detectives reminded Mixon that he did not have to talk. But, Mixon said that he wanted to continue talking. In other words, his comments and behavior made plain that he did not want to stop talking to the detectives. Under these circumstances, Mixon's constitutional rights were not violated. (*People v. Jackson*, *supra*, 1 Cal.5th at pp. 336–337.)

D. <u>Harmless error</u>

Even if the trial court had erred in allowing Mixon's interview to be presented during the prosecution's case-in-chief, that error would have been harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Moore*

38

(2011) 51 Cal.4th 386, 404.) As set forth above, parts of Mixon's statement were featured in his defense. Moreover, his admissions were cumulative to the overwhelming evidence of guilt presented. In particular, his body type and distinctive clothing, captured on video before, during, and after the murders, established that he was one of the shooters.

There was also ample evidence that the instant murders were committed in retaliation for Grant being shot. Specifically, Officer Armenta explained that Grant's shooting would have called for a violent response by his gang. Mixon was a longtime gang member and got new Miller Gangster tattoos after the murders.

III. *Prosecutor's Admission of Part of Hill's Police Interview*

Hill argues that the prosecutor's introduction into evidence of part of his police interview violated his constitutional rights.

A. Relevant proceedings

As set forth above, Hill was interviewed by the police, identified himself in the video taken at the Villas before the murders, and said he only drove the Audi from a location on Mettler Street back to the Villas. After being accused of lying, Hill admitted to driving the Audi back to the Villas, but he claimed he had been pressured to do so. He also made a statement that seemed to acknowledge that he drove during the murders. Evidence of Hill's recorded statement was presented at the preliminary hearing.

1. *Pretrial proceedings*

Prior to trial, Mixon's counsel sought either a separate trial or to exclude evidence of Hill's statement to the police that

39

implicated Mixon.  The prosecutor said that he was not sure if he would introduce any part of the statement, but that if he did, it would only be the portion where Hill identified himself as the driver, and not any part in which he implicated the other defendants.  When the matter was brought up again, counsel for Hill emphasized that if the prosecutor introduced the part of the interview where Hill admitted to driving, then it would also be appropriate to admit other parts of the interview where Hill said that he drove because he was pressured to.  The trial court agreed that portions providing context might also be admissible.

After a recess, the prosecutor said that he intended to introduce the portion of the interview where Hill identified himself as the person on the video at the Villas taken before the murders, wearing the backpack and changing his shoes.  Counsel for Hill noted that he was surprised that the prosecutor did not intend to introduce more of the statement, and indicated that he might still seek to introduce the portion of the interview where Hill said he drove because he was pressured to.  The trial court reserved ruling on whether such evidence would be permitted.

While discussing other evidence prior to trial, the prosecutor changed his mind about what he wanted to present, noting that he did not want to be limited as to what he could present at trial since the defense was aware of the potential evidence, and "things may change."  While ruling on another pretrial issue, the trial court noted that "trials are fluid and things change."

## 2. *Trial proceedings*

In the opening statement for Hill, defense counsel stated that the evidence would show that Hill was neither the person driving the Audi at the moment of the murders, nor when the Audi returned to the Villas. Counsel said that the videos were not clear enough to conclusively show Hill was the driver at either moment. Rather, the video would only show that Hill walked into view right after the Audi arrived at the Villas and parked out of view of the cameras.

During cross-examination of Officer Armenta, counsel for Hill suggested that McKinley was dressed somewhat similarly to Hill and might have been the person who drove the Audi during the murders and back to the Villas. On redirect, Officer Armenta pointed out differences in how McKinley and Hill were dressed (most significantly that Hill had long sleeves and McKinley did not).

The following day, citing the questions asked by Hill's defense counsel, the prosecutor indicated his intent to present that portion of the interview where Hill admitted to driving defendants to commit the murders. During the ensuing conversation, counsel for Hill disputed that he had "opened the door" to the evidence, argued that the entirety of the interview would need to be played to provide the proper context, and asserted that admitting the partial confession would force him to alter his trial strategy after suggesting in his opening statement that the evidence would not establish that Hill had been the driver, even when the Audi arrived back at the Villas. Hill's counsel noted that the prosecutor had specifically indicated it did

41

not intend to play that part of the interview. He further contended that allowing the evidence to be presented would violate Hill's due process and confrontation rights under the state and federal Constitutions.

The trial court stated that the evidence the prosecutor wished to present would contradict "the illusion" suggested by the defense that someone other than Hill drove the Audi back to the Villas. The trial court also agreed that the defense could play more of the interview to provide the relevant context, and that the parties would be allowed additional time to prepare any needed transcript. The trial court did not believe that the prosecutor had acted with the intent to "sandbag" the defense, and that if it felt otherwise it would have excluded the evidence. After all, the defense had been aware of the evidence's existence, and the jury had been told that the attorneys' comments were not evidence and opening statements were merely intended as a roadmap.

Over the prosecutor's objection, the trial court ruled that the portions of the interview that the defense wished to play would also be admitted, including his statement that he drove the Audi because he was afraid he would be harmed if he refused an order, and opined that the statement in its entirety was also quite favorable to the defense. It was convinced that its ruling did not violate Hill's right to a fair trial.

In his closing argument, Hill's counsel argued that Hill was not the person driving at the time of the murders, and alternatively, lacked the intent to kill and participated only because he was pressured to do so by older gang members. Other

than the recorded statement, no evidence was presented supporting a theory Hill participated because he had been intimidated into doing so.

B. Relevant law

The trial court has broad discretion to control the order of proof, and if evidence is directly probative of the charged crimes and can be introduced at the time of the case-in-chief, it should be. (*People v. Case* (2018) 5 Cal.5th 1, 48.) The purpose of this restriction is to avoid sandbagging the defendant, i.e., to avoid any unfair surprise. (*Ibid.*) "'Thus proper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime. It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt. [Citations.]'" (*People v. Thompson* (1980) 27 Cal.3d 303, 330; see also *People v. Case*, *supra*, at pp. 48–49.)

We also apply the abuse of discretion standard of review to any ruling by the trial court on the admissibility of evidence. (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.)

C. Analysis

Here, the trial court did not abuse its discretion in allowing the prosecution to present the challenged evidence. Prior to trial, Hill knew that the prosecution's theory was that he drove the Audi during the murders, knew that his recorded statement helped prove that point, and was surprised when the prosecutor indicated that he did not intend to present it. Hill also knew that the prosecutor's decisions regarding evidence were subject to

43

change.  In other words, although the prosecutor had indicated at first that he did not intend to present the portion of the interview at issue, counsel for Hill was well aware of the evidence's probative value to both sides, and that things could change during trial.

By asking that the evidence be presented, the prosecutor was not suddenly and surprisingly pursuing a different theory of guilt.  Rather, in response to defense counsel's cross-examination of Officer Armenta, he was simply presenting more admissible evidence supporting the theory that Hill drove the Audi to commit the crimes.

Hill was not sandbagged by the prosecutor's actions.  As soon as the prosecutor believed that the circumstances had changed in light of the cross-examination by Hill's counsel, the prosecutor asked for permission to present the evidence.  The trial court agreed with the prosecutor that defense counsel had promoted "the illusion" that someone other than Hill drove the Audi back to the Villas.  In this situation, the trial court acted well within its discretion in allowing the prosecution to introduce portions of Hill's statement to police.

It follows that Hill was not denied a fair trial or was deprived of his constitutional rights.

D.  <u>Harmless error</u>

Even if the trial court had erred by allowing the prosecution to present the challenged portions of Hill's statement to police, that error was harmless in light of the overwhelming evidence of Hill's guilt stemming from his active and intentional participation in these crimes.  (*People v. Arias* (1996) 13 Cal.4th

92, 176 & fn. 34 [no showing that alleged sandbagging was prejudicial in light of strength of other evidence and the nature of the additional evidence presented by the prosecutor].) Shortly after Grant was shot, Hill was texting about it, saying that he intended to "go to the AP's." Thereafter, he went to the Villas and congregated with fellow gang members. His clothing was visible in the Audi just before the murders and when he drove back to the Villas immediately after the murders. And seconds after he drove out of view of the camera at the Villas, he walked back into view with Armstead and Mixon.

Furthermore, in his closing argument, defense counsel argued that Hill was not the driver at the time of the murders.[19] That argument was consistent with Hill's statement to police denying that he drove during the murders. Thus, there was no harm to Hill in allowing portions of his statement to be admitted.

IV. *Alleged Prosecutorial Misconduct*

For the first time on appeal, Armstead and Hill assert that the prosecutor erred during argument in stating that they were "equally guilty" as Mixon, even though they did not fire the fatal shots. Anticipating the People's response that this argument has been forfeited for failure to raise it below, they alternatively argue that their trial attorneys were ineffective for failing to make a timely objection.

---

[19] We reject Hill's contention that the introduction of this evidence forced defense counsel into arguing "three factually inconsistent theories."

A. <u>Relevant proceedings</u>

During closing argument, the prosecutor periodically used the phrase "equally guilty." For example, the slideshow used during the prosecutor's closing argument defined a principal as someone who either committed the crime or aided and abetted the commission of the crime, and further provided that: "A person is <u>equally guilty</u> of the crime whether he committed it personally or aided and abetted the perpetrator who committed it." The following slide defined aiding and abetting, indicating that the requirements included: "The defendant knew the perpetrator was going to commit the crime"; "the defendant intended to aid & abet the perpetrator in committing the crime"; and the defendant "specifically inten[ded]" to aid the commission of the crime.

The prosecutor repeatedly voiced the same point throughout his closing argument. He said express intent to kill was the applicable theory of murder, and he cited facts showing premeditation, such as planning, surveillance, arming, and driving.

The prosecutor said: "A person may be guilty of a crime in two ways: He directly committed the crime, or he aided and abetted someone else, the perpetrator who committed the crime. A person is equally guilty of the crime whether he committed it personally or aided and abetted the perpetrator who committed it." After acknowledging that the shot fired by Armstead did not hit anyone, the prosecutor said: "But it doesn't matter. The law says because he was helping out, he had the intent to kill. It doesn't matter that his gun didn't do the killing. He's equally

46

liable for the murder.  [¶]  Let me say that again.  He is equally—Mr. Hill is equally responsible for the murder even though he didn't pull the trigger.  [¶]  And this jury instruction tells us why: the defendant knew that the perpetrator was going to commit the crime.  We heard from our gang officer.  Our gang officer explained to you that only 10 percent of gangsters are killers; that everybody had a role in the vehicle.  The driver is extremely important.  The passenger is extremely important.  So they knew that this crime was going to happen."

The prosecutor added:  "Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose, and he or she specifically intends to and does in fact aid and facilitate, promote, encourage, instigate.  They're held equally liable; that's the law."

B.  Forfeiture

As pointed out by the People, Armstead and Hill have forfeited any challenge to the prosecutor's remarks by failing to object below.  It follows that they have forfeited any such claim on appeal.  (*People v. Peoples* (2016) 62 Cal.4th 718, 797 [absent evidence of futility, claims of prosecutorial misconduct are forfeited for failure to make a timely objection and request for admonition]; *People v. Nilsson* (2015) 242 Cal.App.4th 1, 25 [defendant's challenge to "equally guilty" instructional language was forfeited for failure to raise it at trial].)

For the sake of completeness, we turn to the merits of their argument.

47

C. <u>Relevant law</u>

Under state law, a prosecutor who uses deceptive or reprehensible methods to persuade either the trial court or the jury has committed misconduct, even if such action does not render the trial fundamentally unfair. (*People v. Morales* (2001) 25 Cal.4th 34, 44; *People v. Hill* (1998) 17 Cal.4th 800, 819.) "[P]rosecutorial misconduct implicates the defendant's federal constitutional rights only if it is so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process. [Citation.]" (*People v. Harris* (1989) 47 Cal.3d 1047, 1084.) Generally, misstatements of the law constitute misconduct. (*People v. Nguyen* (1995) 40 Cal.App.4th 28, 36; *People v. Mendoza* (1974) 37 Cal.App.3d 717, 726–727.)

D. <u>Analysis</u>

Applying these legal principles, the prosecutor did not engage in misconduct. The prosecutor made clear throughout his closing argument that, because Armstead and Hill acted to aid commission of the murders with the specific intent to do so, they were just as guilty of first degree murder as Mixon even though they did not fire the fatal shots. There was no suggestion at any point in the trial that Armstead and Hill had contemplated some other target crime, let alone any instruction suggesting that they could be guilty of murder even though they had only intended to aid a different crime.

Indeed, the prosecutor did not simply make general statements about the law. He also cited specific facts showing each defendant's intent both to assist in the murders and to benefit their gangs. He referred to the tattoos defendants got,

and that, after the shooting, Hill could be seen behaving in a relaxed manner with the other defendants. The prosecutor also reminded the jury that his own comments were not evidence and that the jury should follow the trial court's instructions to the extent there was any conflict with his statements.

Furthermore, the concept that each defendant's mental state had to be considered separately was reinforced during the defense closing arguments. Mixon's attorney argued that Mixon was guilty of second degree, not first degree, murder because there was no showing that he premeditated the crime. Hill's attorney repeatedly argued that there was no evidence that Hill had the requisite intent for aiding and abetting liability. And Armstead's attorney stated several times that the evidence failed to prove that he had the intent to kill. Even the prosecutor's rebuttal acknowledged that he had to prove that each defendant had the requisite intent, and argued that the evidence proved that intent.

Moreover, the trial court instructed the jury regarding the elements of murder and aiding and abetting. It further told the jury that the evidence needed to be considered separately "as it applies to each defendant," and that "each charge for each defendant" needed to be decided separately. And, the jury was instructed that each defendant needed to have "specific intent" in order to be found guilty of murder. In fact, when the jury asked during deliberations whether Armstead and Hill could be found guilty of murder simply because they were present at the scene when the fatal shots were fired, the trial court told the jurors "no" and reinstructed on the intent required for aiding and abetting.

49

In short, the prosecutor's comments were correct statements of law in context.[20]

E. Harmless error

Even if the prosecutor had made misstatements, they would have been harmless. (See, e.g., *People v. Collins* (2010) 49 Cal.4th 175, 229 [no prejudice where "prosecutor's remarks were somewhat ambiguous and constituted only a small portion of her larger argument"].) As set forth above, there is overwhelming evidence that Hill and Armstead premeditated the murders. After Grant was shot, Hill texted someone to say that his "little cousin" Poppie had been shot and that he intended to "go to the AP's." And Armstead armed himself with a gun and went to rival territory at night with a companion who was armed with a rifle. The moment the car stopped, he jumped out of the car and fired. Although he did not aim his first shot at the victims, he did fire into a home and stopped firing only because his gun jammed. His participation also gave his companions, fellow gang members, the courage to carry out the shootings. In light of the strength of this evidence, the jury instructions, and the totality of the attorneys' closing arguments, Hill and Armstead were not prejudiced by the prosecutor's use of the phrase "equally guilty."

V. *Denial of Request for Heat of Passion Voluntary Manslaughter Instruction*

Defendants argue that the trial court erred in refusing to instruct on heat of passion voluntary manslaughter.

---

[20] Because the prosecutor's comments were accurate in context, it follows that Armstead and Hill's ineffective assistance of counsel argument fails.

50

A.  Relevant proceedings

At the close of evidence, Mixon's defense counsel requested that the trial court instruct the jury on heat of passion voluntary manslaughter based upon the evidence that Mixon was upset about Grant having been shot.  Hill and Armstead joined in the request.

The prosecutor opposed the request, noting that defendants did not indicate that they were consumed by passion while interacting with Officer Armenta and did not act as if consumed by passion in the video showing them after the murders.  Furthermore, defendants had hours to cool off between the time Grant was shot and when they committed the murders.

The trial court denied defendants' request.  It explained that even crediting Grant's testimony that Mixon was upset at the hospital, there was no evidence to support an instruction on heat of passion.  That said, the trial court informed defendants that they were welcome to argue that provocation had prevented them from premeditating the murders.

B.  Relevant law

A trial court must instruct on lesser included offenses when there is substantial evidence the defendant is guilty only of the lesser offense.  (*People v. Vargas* (2020) 9 Cal.5th 793, 827.) "Voluntary manslaughter, a lesser included offense of murder, is defined as the unlawful killing of a human being without malice." (*Ibid.*, citing § 192 & *People v. Rios* (2000) 23 Cal.4th 450, 465.) An instruction on voluntary manslaughter is required where there is substantial evidence the defendant acted in the heat of passion.  A heat of passion killing "is one caused by an

51

unconsidered reaction to provocation rather than the result of rational thought." (*People v. Vargas*, at p. 828.) "If reason ""was obscured or disturbed by passion"" to so great a degree that an ordinary person would ""act rashly and without deliberation and reflection,"" [then it can be said that the] killing arose from ""passion rather than from judgment."" [Citation.]" (*Ibid.*; accord *People v. Landry* (2016) 2 Cal.5th 52, 97 ["heat of passion sufficient to reduce murder to manslaughter exists only where the killer's reason was actually obscured as the result of a strong passion"].)

"'[T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene.' [Citation.]" (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 649.) """[I]f sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter."" [Citation.]" (*Ibid.*; *People v. Nelson* (2016) 1 Cal.5th 513, 539 ["it is not sufficient that a person 'is provoked and [then] *later* kills"].) """The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim."" [Citation.]" (*People v. Beck and Cruz, supra*, at p. 649.) Planned revenge does not satisfy the provocation requirement. (*People v. Souza* (2012) 54 Cal.4th 90, 115–117; *People v. Breverman* (1998) 19 Cal.4th 142, 163 [the passion aroused can be any extreme emotion "other than revenge"].)

52

C.  Analysis

Applying these legal principles, defendants were not entitled to a heat of passion instruction.  There was no evidence that the victims were involved in any provocation or that defendants acted without reflection.  There was also no evidence that defendants acted while in the grips of passion such that judgment could not and did not intervene.  In fact, defendants had hours to calm down after Grant was shot.

*People v. Brooks* (1986) 185 Cal.App.3d 687 does not compel a different result.  In that case, the Court of Appeal held that the provocation that incites the defendant to homicidal conduct in the heat of passion must "be conduct reasonably believed by the defendant to have been engaged in by the victim." (*People v. Lee* (1999) 20 Cal.4th 47, 59; *People v. Brooks*, *supra*, at p. 694 ["the disclosure of information that the victim murdered a family member of the defendant is legally adequate provocation for voluntary manslaughter"].)  In the instant case, there was no evidence whatsoever that the two innocent murder victims had anything to do with the shooting of Grant.

D.  Harmless error

Even if the trial court had erred in failing to instruct on voluntary manslaughter, that error would have been harmless under any standard.  (*Chapman v. California*, *supra*, 386 U.S. at p. 24; *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

First, the trial court's refusal to instruct on heat of passion manslaughter did not prevent the defense attorneys from arguing that defendants were so emotional that they were unable to premeditate the killings.  And, the jurors' finding that defendants

53

acted with premeditation shows that they rejected any suggestion that defendants acted while consumed by emotion and passion so strong that judgment could not and did not intervene.  (See *People v. Wang* (2020) 46 Cal.App.5th 1055, 1071–1072 [failure to instruct on heat of passion was harmless because jury rejected heat of passion by finding defendant premeditated the murder].)

Second, any error was harmless in light of the nature of the evidence.  As discussed, any evidence of extreme emotion was very weak, and evidence of strategic planning was very strong.  Defendants gathered with other gang members after Grant was shot; they then left in cars with other gang members to commit the murders.  After the crimes, Hill got tattoos celebrating the executions.  Armstead either already had a "Crip killer" tattoo, or got one to celebrate the murders.

And, notably, a theory of heat of passion was directly contrary to the other theories advanced by the defense attorneys.

Accordingly, any failure to instruct on heat of passion manslaughter was harmless.

VI. *Denial of Request to Tell the Jury that Provocation Could Reduce a Murder from First Degree to Second Degree (CALCRIM No. 522)*

Defendants argue that the trial court erred in denying their request to tell the jury that provocation could reduce a murder from first degree to second degree.  According to defendants, substantial evidence supported such an instruction pursuant to CALCRIM No. 522.

CALCRIM No. 522 provides:  "Provocation may reduce a murder from first degree to second degree [and may reduce a

54

murder to manslaughter]. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.] [¶] [Provocation does not apply to a prosecution under a theory of felony murder.]"

The instruction is a pinpoint instruction and need be given only upon request and where supported by substantial evidence. (*People v. Rivera* (2019) 7 Cal.5th 306, 328.)

For the same reasons set forth in connection with the heat of passion voluntary manslaughter discussion, the trial court appropriately declined to instruct the jury with CALCRIM No. 522. There was no substantial evidence that the victims provoked defendants, or that defendants subjectively acted without reason, or that defendants acted immediately. Defendants were welcome to argue to the jury that the facts showed they did not act with intent or premeditation, but that is not the same as concluding that substantial evidence showed that they acted as a result of provocation.

*People v. Berry* (1976) 18 Cal.3d 509 does not compel a different result. In that case, the evidence included testimony by the defendant and an expert that the "defendant killed in a state of uncontrollable rage, of passion," and such testimony was supported by evidence that the killing occurred after "the long course of provocatory conduct, which had resulted in intermittent outbreaks of rage [that] reached its final culmination in the

apartment when [the victim] began screaming." (*Id*. at p. 516.)
As set forth above, that is not what occurred here.

Even if the trial court had erred in declining to give this instruction, that error would have been harmless. (See *People v. Pearson* (2012) 53 Cal.4th 306, 325 [failure to give pinpoint instruction evaluated under *Watson* harmless error standard]; see also *People v. Wharton* (1991) 53 Cal.3d 522, 571–572 [failure to give pinpoint instruction harmless under *Watson* since, among other things, the instructions did not "preclude" the jury from considering the defense theory, and the jury verdict showed the jury rejected the defense theory].)

The instructions regarding murder specified that murder required intent to kill or intentional commission of an act dangerous to human life, and that first degree murder required premeditation. CALCRIM No. 521, which describes premeditation, specified that a "decision to kill made rashly, impulsively, or without careful consideration is not deliberate or premeditated." Thus, the instructions given did not preclude the defense from arguing that circumstances caused them to act rashly and without reflection.

In fact, Mixon did advance that argument as one of several incompatible theories. The evidence powerfully established that defendants acted with premeditation, and the jury's finding that defendants acted with premeditation showed that it rejected a theory of provocation.

VII. *Duress is not a Defense to Murder*

Hill argues that the trial court erred when it told the jury that duress is not a defense to murder. Specifically, he claims

56

that the trial court erred by giving CALCRIM No. 3402 even though he was not relying upon the affirmative defense of duress to defeat the murder charge against him.  He contends that this instruction should not have been given when his theory was that because he was pressured to participate in a homicide, he did not share the actual killer's specific intent to kill.  Armstead and Mixon join in this argument.

A.  Relevant proceedings

During the discussion among counsel and the trial court regarding jury instructions, Mixon's counsel asked that the jury be instructed on duress as a defense to murder.  She theorized that the evidence supported the conclusion that Speed had orchestrated the murders and participated by using Hill's phone and relaying the victims' location.  Armstead and Hill joined in the request.  The trial court denied the request because duress was not a defense to murder and because there was no substantial evidence that any threat was ever issued.  Counsel for Hill and Mixon said that they still intended to argue to the jury that the duress prevented their clients from forming intent for murder.  The trial court determined that defendants could argue that the evidence established that they did not form intent, but also agreed with the prosecutor's request to instruct the jury that duress was not a defense to murder.

Pursuant to CALCRIM No. 3402, the trial court instructed the jury: "A defendant is not guilty of a crime if he acted under duress.  The defendant acted under duress if, because of [a] threat or menace, he believed that his [or] someone else's life would be in immediate danger if he refused [the] demand or

57

request to commit [a] crime. The demand or request may have been express[ed] or implied.

"The defendant's belief that his [or] someone else's life [is] in immediate danger must have been reasonable. When deciding whether the defendant's belief [is] reasonable, consider all [of] the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in the same position as the defendant would have believed. [¶] A threat of future harm is not sufficient[. A] danger to life must have been immediate. [¶] This defense does not apply to the crime of murder."

B. Relevant law

Section 26 provides: "Persons (unless the crime be punishable with death) who committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused." "[T]he defense of duress requires a reasonable belief that threats to the defendant's life (or that of another) are both imminent and immediate at the time the crime is committed [citations]." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 100.) "[D]uress is not a defense to murder, nor does duress reduce murder to manslaughter. [Citations.]" (*People v. Landry*, *supra*, 2 Cal.5th at p. 91.) "'[I]f duress is recognized as a defense to the killing of innocents, then a *street or prison gang* need only create an internal reign of terror and murder can be justified, at least by the actual killer.' [Citation.]" (*Id*. at p. 92.) "'[A] person who kills an innocent

58

believing it necessary to save the killer's own life intends to kill unlawfully, not lawfully.' [Citation.]" (*Ibid*.)

"[A] killing under duress, like any killing, may or may not be premeditated, depending on the circumstances. If a person obeys an order to kill without reflection, the jury might find no premeditation and thus convict of second degree murder." (*People v. Anderson* (2002) 28 Cal.4th 767, 784.) The standard instruction regarding premeditation conveys that concept. (*Ibid*.; accord *People v. Landry*, *supra*, 2 Cal.5th at pp. 93–94; *People v. Hinton* (2006) 37 Cal.4th 839, 883 [threats and menace do not constitute a defense to murder]; *People v. Vieira* (2005) 35 Cal.4th 264, 290 ["because duress cannot, as a matter of law, negate the intent, malice or premeditation elements of a first degree murder, we further reject defendant's argument that duress could negate the requisite intent for one charged with aiding and abetting a first degree murder"].)

C. <u>Analysis</u>

Applying these legal principles, the trial court properly instructed the jury that duress is not a defense to murder.

To the extent that the defense theory was that defendants knew that their gang was so violent that they were terrified that they would be killed if they refused to help kill random people,[21]

---

[21] Early in the proceedings, counsel for Hill specifically said that he wanted evidence admitted that Mixon had asserted that he was afraid to refuse an order from a more senior gang member. During the trial, he also asked Officer Armenta about the danger posed to a gang member who refused an order. And, during closing argument, counsel for Hill argued that Hill

59

and that terror prevented them from sharing the actual killer's specific intent to kill, nothing in CALCRIM No. 3402 precluded the jury from so finding. In fact, other instructions allowed the jury to find that defendants did not have the specific intent to kill. It follows that it was not reasonably likely that the jury misapplied CALCRIM No. 3402.

Likewise, to the extent Hill hoped to argue that he premeditated the murders, but did so reluctantly because he decided that it was preferable to kill strangers rather than risk the possibility that he might be harmed, that is an inappropriate attempt to argue duress. (*People v. Anderson*, *supra*, 28 Cal.4th at p. 784.)

D. <u>Harmless error</u>

Even if the trial court had erred in refusing this instruction, that error would have been harmless. There was no evidence that defendants ever actually threatened or had been threatened in the past or knew someone who had been fatally disciplined, let alone that such threat might be immediately carried out. Moreover, as set forth above, the evidence overwhelmingly established that they premeditated the murders. And, the jury had the opportunity to find them guilty of second degree murder or, as to Hill, of being an accessory after the fact,

---

participated only because he was ordered to do so by senior members and therefore could not be said to have acted with intent to aid in a murder. Likewise, Armstead's counsel argued during his closing that Armstead acted only because he was worried that he would be harmed if he did not participate.

60

but determined that they were guilty of premeditated murder. (*People v. Hinton, supra,* 37 Cal.4th at p. 883 [jury verdict showed it rejected theory of duress].)  It follows that any alleged instructional error was harmless as a matter of law.

VIII.  *Alleged Cumulative Error*

Armstead contends that the alleged errors, when combined, created cumulative prejudice, requiring reversal of the judgment. Hill joins in this argument.  However, "[l]engthy criminal trials are rarely perfect, and [courts] will not reverse a judgment absent a clear showing of a miscarriage of justice."  (*People v. Hill, supra,* 17 Cal.4th at p. 844.)  No such showing appears here.  There were no errors.  And, even if there were, they were harmless.  They did not combine to render this trial unfair.  (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009 [defendants are entitled to a fair trial, not a perfect one].)

IX.  *Superfluous Multiple Murder Finding is Stricken*

Following trial, defendants were each convicted of two counts of first degree premeditated murder (§ 187, subd. (a)).  As to each defendant and both counts, the jury found true the allegations that defendants had committed multiple murder (§ 190.2, subd. (a)(3)).  As to both murder convictions, the trial court sentenced defendants to LWOP.

Defendants argue that only one multiple murder special circumstance should have been found true.  The People agree.

We agree with the parties that only one multiple murder special circumstance should have been found true.  (See, e.g., *People v. Buenrostro* (2018) 6 Cal.5th 367, 431 [striking the "superfluous" multiple murder finding].)  Defendants' LWOP

sentences on both counts are not impacted. (See *People v. Garnica* (1994) 29 Cal.App.4th 1558, 1564 [a single multiple-murder special circumstance finding can support multiple sentences of life without parole].)

X. *The 10-Year Gang Enhancement is Stricken as to Armstead*

Armstead and Mixon argue that the 10-year gang enhancements imposed against them were improper. Relying on *People v. Lopez* (2005) 34 Cal.4th 1002, 1004 (*Lopez*), they assert that the trial court was required to impose the 15-year parole eligibility date set forth in section 186.22, subdivision (b)(5) because each received a life sentence.

We are not convinced. Because a term of LWOP contains no anticipated parole date, it would be incongruous to include a minimum parole date on such a term. The purpose of sentencing a defendant to additional enhancements, such as the 10-year gang enhancement is to protect against the eventuality that the defendant's sentence might one day be reduced on direct appeal or habeas corpus. (See, e.g., *People v. Garnica, supra,* 29 Cal.App.4th at p. 1564.)

Moreover, the California Supreme Court has suggested that the minimum parole eligibility provision was never intended to apply to persons sentence to LWOP. In *Lopez*, the court examined the history of the California Street Terrorism Enforcement and Prevention Act (STEP Act) and noted that a 1988 enrolled bill report that analyzed the financial impact of the provision stated: ""This proposed provision relating to life terms [former section 186.22, subdivision (b)(3), now section 186.22 [subdivision] (b)(5)] would apply to all lifers (except life without

62

possibility of parole).""" The court concluded that "at the time the STEP Act was enacted, the predecessor to section 186.22[, subdivision] (b)(5) was understood to apply to *all* lifers, except those sentenced to life without the possibility of parole." (*Lopez*, *supra*, 34 Cal.4th at p. 1010.) Similarly, in *People v. Montes* (2003) 31 Cal.4th 350, the court examined in detail the 1988 enrolled bill report, which summarized the terms that would be affected by what is now section 186.22, subdivision (b)(5), and noted that the terms of first degree murder would be affected only when there were no special circumstances. (See *People v. Montes*, *supra*, at pp. 357–358, fn. 10.) Though these discussions are dicta, they are nevertheless persuasive. (*People v. Valencia* (2011) 201 Cal.App.4th 922, 930–931.) Accordingly, under this analysis, the trial court imposed the correct gang enhancement.

However, unlike Mixon, Armstead was not found to have personally discharged a firearm in the commission of the murders.[22] Although Armstead certainly discharged a firearm, it appears that the jury was only asked, and only found true as to him, that a principal (Mixon) discharged a firearm. Thus, as to Armstead, the trial court erred in imposing both the 10-year gang enhancement under section 186.22, subdivision (b)(1)(C), and the firearm enhancement under section 12022.53, subdivision (e)(1),

---

[22]     At sentencing, the trial court said, without objection, that the jury had found as to both counts that Armstead personally discharged a firearm within the meaning of section 12022.53, subdivision (d). This appears to have simply been a mistake by the trial court.

63

because the firearm enhancement was based on the gang enhancement.**23** (*People v. Brookfield* (2009) 47 Cal.4th 583, 590.) The 10-year gang enhancement as to Armstead must be stricken.

XI. *The Parole Revocation Fine is Stricken*

As to each defendant, the trial court imposed and suspended a $5,000 parole revocation fine pursuant to section 1202.45. However, defendants were sentenced on both counts to LWOP. Thus, the parole revocation fine must be stricken. (*People v. Brasure* (2008) 42 Cal.4th 1037, 1075; *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183.)

XII. *Amended Abstracts of Judgment Must Reflect that the Direct Victim Restitution is Joint and Several*

The trial court's July 31, 2019, and August 13, 2019, minute orders from defendants' restitution hearing reflect that direct victim restitution must be paid, and further specified that the obligation be joint and several. Thus, as defendants request and as the People agree, the abstracts of judgment must be amended to reflect that the obligation is joint and several.

XIII. *Hill's Request for Corrections to the Probation Report*

Apparently confusing Hill with Armstead, the probation officer's report incorrectly asserts that Hill had been armed and fired a handgun during the commission of these crimes. Hill's

---

**23** Section 12022.53, subdivision (e)(2), provides that "[a]n enhancement for participation in a criminal street gang . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally discharged a firearm in the commission of the offense."

64

trial counsel mentioned the errors at sentencing and asked that the memorandum that the defense prepared for sentencing be attached when the various documents were sent to the Department of Corrections. The trial court confirmed that they would be.

That said, according to Hill, the misstatements in the probation report have not been corrected. Thus, he asks that we direct the trial court to make appropriate revisions to the probation report. Notwithstanding the People's opposition to this request,[24] we agree with Hill.

Courts have an inherent power to correct clerical errors in records so as to make the records "'reflect the true facts.'" (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) "'The court may correct such errors on its own motion or upon the application of the parties.'" (*Ibid*.) And courts may correct clerical errors at any time. (*Ibid*.) In fact, courts have an obligation to correct inaccuracies in court records, especially those transmitted to the California Department of Corrections and Rehabilitation; that includes the probation report. (§§ 1203c, subd. (a)(1), 1203.01.)

The errors can easily be corrected on remand. Accordingly, we direct the trial court to order an amended probation report correcting the misstatements.

---

[24] The People overstate Hill's request in their respondent's brief. Hill is not seeking an entirely new probation report; he only asks that the two misstatements be corrected.

## DISPOSITION

The trial court is directed to prepare new abstracts of judgment that reflect (1) no parole revocation fine as to all three defendants, and (2) a joint and several obligation to pay victim restitution. The trial court is also directed to strike the 10-year gang enhancement as to Armstead. The trial court is further directed to order that the errors in Hill's probation report be corrected and then transmitted to the California Department of Corrections and Rehabilitation. In all other respects, the judgments are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
ASHMANN-GERST


We concur:



_____, P. J.
LUI



_____, J.
HOFFSTADT


66